UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
SCANGE VOLANT,

                                         Plaintiff,

                   -against-

COUNTY OF NASSAU, NASSAU COUNTY SHERIFF
ANTHONY J. LaROCCO, in his individual and official
capacities, and CORRECTIONS OFFICER JOHN DOES
#1-10 (fictitiously named), in their individual and official
capacities,

                                      Defendants.
------------------------------------------------------------------------ X

**Docket No.:**


**COMPLAINT**


**JURY TRIAL DEMANDED**

Plaintiff SCANGE VOLANT, by his attorneys, Horn Wright, LLP, complaining of Defendants COUNTY OF NASSAU, NASSAU COUNTY SHERIFF ANTHONY J. LaROCCO, in his individual and official capacities, and CORRECTIONS OFFICER JOHN DOES #1-10 (fictitiously named), in their individual and official capacities, alleges as follows:

**PRELIMINARY STATEMENT**

1.      This is a civil rights action in which Plaintiff, SCANGE VOLANT ("VOLANT" and/or "Plaintiff") seeks relief from Defendants COUNTY OF NASSAU, NASSAU COUNTY SHERIFF ANTHONY J. LaROCCO, in his individual and official capacities, and CORRECTIONS OFFICER JOHN DOES #1-10 (fictitiously named), in their individual and official capacities (hereinafter, collectively "Defendants") committing acts under color of law and depriving Plaintiff of rights secured under 42 U.S.C. § 1983 grounded in rights secured to him under the First, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

2.      Plaintiff alleges that Defendants engaged in unlawful conduct. Specifically, during the course of Plaintiff's detention at the Nassau County Correctional Center, Plaintiff was injured

as a result of a slip and/or trip and fall on a premises owned and/or controlled and/or maintained by Defendant COUNTY OF NASSAU and, further, that the slip and/or trip and fall was the result of the actions and/or omissions of Defendants. Defendants' deliberate indifference to Plaintiff's safety caused his exorbitant injuries and violated his Eighth and Fourteenth Amendment rights against cruel and unusual punishment. Further, Defendants' denial of Plaintiff's access to the Courts violated his First, Fifth, and Fourteenth Amendment rights.

3.      Plaintiff alleges that Defendants engaged in unlawful conduct. Specifically, during the course of Plaintiff's pre-trial detention at the Nassau County Correctional Center, Plaintiff was subjected to inhumane conditions that pose unreasonable and substantial risks to his health and safety. Plaintiff was forced to live in a dorm that would constantly flood due to the condition of the roof and leaking plumbing, as well as inadequate medical care.

4.      Plaintiff seeks damages, both compensatory and punitive, award of costs, disbursements, interest, attorney's fees, and such other and further relief as this Court deems just and equitable.

## JURISDICTION

5.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the First, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. Jurisdiction is conferred upon this Court by 42 U.S.C. § 1983 and by 28 U.S.C. §§ 1331 and 1343(3) and (4) of the aforementioned Constitutional provisions.

6.      Supplemental jurisdiction over Plaintiff's state law claims exists pursuant to 28 U.S.C. § 1367(a).

**VENUE**

7.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) since all of the events and omissions giving rise to Plaintiff's claims occurred within the County of Nassau; the actual place of employment of the individually named Defendants and Doe Officers is within the County of Nassau in the Eastern District of New York; and the County of Nassau is within the jurisdiction of the Eastern District of New York.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

8.      Plaintiff attempted to fulfill the requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997(e)(a), requiring inmates to exhaust available, administrative remedies prior to filing suit under 42 U.S.C. § 1983 alleging violations of their Constitutional rights, but was denied access to the process and/or prevented from filing such.

**NOTICE OF CLAIM**

9.      Plaintiff filed a timely Notice of Claim with the County of Nassau on or about August 15, 2024. More than 30 days have elapsed since the filing of the Notice of Claim, and adjustment or payment thereof has been neglected or refused.

**THE PARTIES**

10.      Plaintiff SCANGE VOLANT ("VOLANT" or "Plaintiff") is a resident of the United States who lives within the State of New York.

11.      Upon information and belief, at all relevant times described herein, Defendant COUNTY OF NASSAU ("COUNTY") was and continues to be a municipal corporation organized and existing by virtue of the laws of the State of New York.

12.      Upon information and belief, at all relevant times described herein, Defendant COUNTY, by its agents and/or employees, owned, operated, maintained, possessed, supervised,

and controlled the Nassau County Correctional Center ("NCCC") and all Corrections Officers thereof, and is responsible for providing a safe and secure environment for detainees in its custody. COUNTY is charged by the laws of the State of New York with authority to maintain the NCCC and is responsible for its confinement conditions and for the treatment of its inmates.

13. At all relevant times herein, NASSAU COUNTY SHERIFF ANTHONY J. LaROCCO ("LaROCCO") was and is the Sheriff of COUNTY, acting under color of state law, and is responsible for providing a safe and secure environment for detainees in his custody. Defendant LaROCCO is responsible for the day-to-day operations of NCCC. As Sheriff, he has custody, control, and the charge of the NCCC and its inmates. LaROCCO is legally responsible, in whole or in part, for the operation of the NCCC, for the conditions therein, and the health and safety of persons confined or incarcerated therein.

14. Upon information and belief, at all relevant times described herein, Defendant CORRECTIONS OFFICER JOHN DOES #1-10 (fictitiously named) ("DOES") are individuals and employees of COUNTY with an actual place of employment within the County of Nassau, State of New York, who are being sued in their individual and official capacities. At all relevant times described herein, DOES were acting under color of state law within the scope of their employment as Corrections Officers and/or supervisors employed by Defendant COUNTY, and work under the supervision, direction, and/or control of their supervisors in the Nassau County Sheriff's Department ("NCSD") and NCCC.

### **FACTUAL ALLEGATIONS**

15. At all relevant times herein, Plaintiff was housed at NCCC, as a pre-trial detainee under the care and custody of Defendants.

4

16.     NCCC is located at 100 Carman Avenue, East Meadow, New York and, on information, NCCC is an agency, subdivision, and/or instrumentality of COUNTY.

17.     Plaintiff suffers from glaucoma and requires prescription eye drops to manage the condition.

18.     On or about August 2023, following Plaintiff's incarceration, he was given a generic brand of prescription eye drops, which differed from eye drops he had previously used and which had caused him no issues.

19.     Upon using the brand provided by Defendants, Plaintiff experienced adverse reactions, including pain and burning sensations in his eyes.

20.     Plaintiff complained and repeatedly requested the original brand of eye drops, which had not caused any complications.

21.     Plaintiff further reported worsening vision and requested an appointment with a specialist.

22.     As a result of Defendants' failure to provide appropriate medical care, Plaintiff lost vision in his right eye and now suffers from severely limited vision in his left eye.

23.     On or about November 5, 2024, Plaintiff was finally brought to the medical unit for an examination with a nurse.

24.     The nurse inadvertently provided Plaintiff with an antifungal solution in lieu of his prescribed glaucoma eyedrops.

25.     Due to his limited vision and believing he had been provided with the correct medication, Plaintiff unknowingly applied the antifungal solution into his eyes.

26.     As a result of this, Plaintiff suffered additional pain, injury, and further deterioration of his remaining vision.

27. No negligence on the part of Plaintiff contributed to the occurrence alleged herein in any manner whatsoever.

**Conditions at NCCC**

28. NCCC has a history of violating minimum health and safety standards for correctional facilities in the State of New York[1]. In a 2011 letter to then Acting Sheriff Sposato, Thomas A. Beilein, Chairman of the State Commission of Correction, outlined a series of long-standing violations at the jail. Per the Commission, of the 27 violations cited by NYS, 14 violations remain, including poor maintenance of the shower units as well as not correcting sanitation violations cited over the past 27 months. Beilein stated that "[t]his is a . . . chronicle of widespread and persistent violations of state regulations," that COUNTY should have established a plan to clean and maintain.

29. Plaintiff was forced to live in squalid, unhygienic, and hazardous living conditions that pose a substantial and ongoing risk to his physical and mental health. Many of the individuals detained in NCCC have been housed in other correctional facilities as the result of either transfers or previous or subsequent incarcerations, and they describe the uninhabitable conditions at the NCCC as the worst conditions of any jail or prison they have known. On information and belief, all of the conditions described herein have persisted regularly since at least 2011.

30. NCCC's plumbing problems have created an unsanitary environment for the individuals detained there by exposing them to constant flooding and human waste on a regular and ongoing basis.

---

[1] See https://www.nytimes.com/2000/09/16/nyregion/14-month-federal-study-denounces-cruel-conditions-at-the-nassau-county-jail.html

6

31.     The poor plumbing causes the toilets and sinks, contained within each of the individual cells in the dorms, to constantly flood and/or leak.

32.     Similarly, the roof at the correctional facility is in such disrepair that it is constantly leaking. During any rainstorm, water seeps into the dorms through the ceiling and light fixtures, causing water to accumulate in the sleeping areas and common areas. This was particularly the case in Plaintiff's dorm where these problems seem to be the worst. In an attempt to alleviate some of these problems, NCCC staff would overhang plastic tarps on the ceilings in order to catch and divert water.

33.     On information, the roof was in such disrepair that on one occasion there was a partial roof collapse.

34.     Nearly every night, when the detainees are sleeping (and cannot make a plea for assistance), water and waste would accumulate in the cells and sometimes overflow onto the cell floors. The water accumulation would be even worse on nights and/or days when it rained.

35.     The common areas of the dorms would similarly get flooded as water seeped out from the cells, or from the poor plumbing in the showers or leaks from the roof.

36.     Detainees wake up daily to accumulated water and waste, causing them to regularly vomit, cough, and suffer from nausea and severe headaches due to the fumes. In Plaintiff's dorm, detainees are regularly forced to tread through water in their cells and common areas. Plaintiff and others would attempt to mop up the water, but at times the flooding was so bad that it was simply futile to contain the water or the stench.

37.     Plaintiff, as well other detainees, raised the plumbing and roof issues with Corrections officials on many occasions. Nevertheless, the plumbing and roof issues were never fixed.

38.     The showers at NCCC are decrepit, coated in black mold, and reek of mildew.  The faucets and pipes are rusted over and constantly leak.

39.     At times, sewage backs up out of the shower drains, and there is often standing water in the showers because the drains are frequently clogged.

40.     When Plaintiff and other NCCC detainees shower, they try to not touch anything in the showering area in an attempt to avoid contact with the mold, mildew, rust, and possible sewage.

41.     Routine exposure to these unsanitary conditions has given Plaintiff and, upon information, other detainees skin conditions.

42.     COUNTY, Corrections Officers, and medical staff in NCCC are well aware of the unsanitary conditions of the dorms.

43.     COUNTY, through NCSD, the County Executive, and the Legislature, has engaged in a pattern and practice of deliberate indifference to the inhumane and unconstitutional conditions at NCCC.

44.     COUNTY has systematically and deliberately ignored or failed to take reasonable measures to address the visibly deplorable and unconstitutional conditions at NCCC. As described in detail in this Complaint, the facilities are constantly flooded by either water or human waste, filled with rust and holes, the roof is in complete disrepair adding to leaks and water accumulation in many areas inside the facilities, and the tiles are detached and lifting off the floor. Areas of the walls, ceilings, and showers are covered in black mold, and detainees are forced to live in and be exposed to each others' filth and waste.

45.     COUNTY has also systematically and deliberately ignored and/or failed to take reasonable measures to address the complaints about the deplorable and unconstitutional

8

conditions raised by the detainees in NCCC. For years, the men detained in NCCC have submitted grievances through NCCC's complaint procedures describing the conditions set forth in this Complaint and have sought medical treatment for their injuries arising from these conditions.

46.     These uninhabitable and hazardous conditions are the product of decades of neglect and the refusal by COUNTY to adequately maintain NCCC and ensure that there are appropriate and humane conditions for its detainee population.

47.     COUNTY knew or should have known that NCCC was not properly maintained, has been permitted to fall into total disrepair, and that this continued failure to address the problem has reached desperate proportions.

48.     The foregoing policies, acts, inactions, omissions, and systematic failures are the official policies, practices, and customs of Defendant COUNTY. The foreseeable result of these policies, practices, and customs was the further deterioration of the already inhumane conditions at NCCC.

49.     Defendant COUNTY was deliberately indifferent to the unconstitutional conditions at NCCC and established a policy, practice, and/or custom of approving and tolerating the unconstitutional conditions by refusing to remediate them.

50.     Despite knowledge of such unlawful policies, practices, and/or customs, Defendant COUNTY's policy-making officials and officials with oversight responsibilities over NCCC have not taken steps to terminate or remediate these policies, practices, and/or customs, and instead have supported, ratified, or implemented these policies, practices, and/or customs through their active encouragement or deliberate indifference to the effect of such policies, practices, and/or customs upon the Constitutional rights of persons in their care or custody.

51.    As a direct and proximate result of COUNTY's persistent and widespread practice and official policy of failing to provide for even the most necessary and urgent repairs of the facilities, or to even minimally address decades of overcrowding, the men detained in NCCC have been forced to live in inhumane conditions that deprive them of their Constitutional rights.

52.    On or about May 18, 2024, while Plaintiff was in the common area of the dorm at NCCC, while walking in the common area, he was caused to slip and/or trip and fall, and sustain severe and permanent injuries due to the defective condition present in the common area.

53.    Following the incident, Plaintiff was visibly injured and calling for assistance; however, no Corrections Officers were present, and other detainees were forced to assist Plaintiff in getting up.

54.    Defendant DOES assigned to the areas where Plaintiff's injuries occurred were not present and/or nowhere to be found.

55.    Once Defendant DOES arrived, Plaintiff immediately complained that he was in pain and needed immediate medical attention.

56.    Defendants have a duty to provide competent medical and custodial care to their pre-trial detainees.

57.    Plaintiff's requests for medical attention were ignored and, despite it being apparent that Plaintiff had suffered serious physical injuries, Plaintiff was denied medical attention by Defendants.

58.    Plaintiff submitted numerous daily complaints regarding his injuries and the severe pain he was being forced to endure.

59.     Despite the complaints and seriousness of his injuries, Plaintiff was not provided with adequate medical treatment, ultimately rendering him unable to feed himself, brush his teeth, write, or pick items up.

60.     The injuries Plaintiff suffered were caused solely by the conduct of Defendants, and Plaintiff in no way contributed to or caused the injuries he suffered.

61.     Defendants' intentional, reckless, negligent, or deliberately indifferent behavior caused Plaintiff conscious pain and suffering, permanent physical injuries, and emotional harm.

62.     Defendants were aware and knew and/or had reason to know of the substantial risk to Plaintiff, and individuals like Plaintiff, to his physical and mental health and safety. Despite this knowledge, Defendants disregarded said risk.

63.     Defendants were well aware of the inhumane, toxic, and dangerous conditions at NCCC but failed to take any measures to correct and/or repair same.

64.     As a result of the slip and fall, Plaintiff was bleeding and suffered a concussion, multiple blackouts, psychological anguish, permanent injuries, and disabilities.

65.     Defendants have a duty to provide competent medical and custodial care to their pre-trial detainees.

66.     That the injuries Plaintiff suffered were caused solely by Defendants' conduct and Plaintiff in no way contributed to or caused the injuries he suffered.

67.     Defendants' intentional, reckless, grossly negligent, or deliberately indifferent behavior caused Plaintiff conscious pain and suffering, permanent physical injuries, and emotional harm.

68.     The injuries suffered by Plaintiff are permanent in nature.

**Denial of Access to Courts**

69.     On or about August 15, 2024, Plaintiff served and filed his Notice of Claim upon Defendant COUNTY.

70.     On or about September 13, 2024, Defendant COUNTY issued a subpoena and scheduled a 50-h hearing pursuant to Gen. Mun. Law § 50-h for October 31, 2024.

71.     Prior to the scheduled hearing, Plaintiff was transferred to state custody. Defendant COUNTY rescheduled the 50-h hearing for December 5, 2024.

72.     Attempts were made with NYSDOCCS to produce Plaintiff virtually for the scheduled 50-h hearing. Unfortunately, NYSDOCCS advised that they did not have functioning video equipment and could only produce Plaintiff by telephone. Further, NYSDOCCS did not have a time frame within which their video equipment would be repaired.

73.     Defendant COUNTY refused to hold the 50-h hearing telephonically. Defendant COUNTY would only hold the 50-h hearing in person at its office or virtually.

74.     New York General Municipal Law §§ 50-e, 50-h, and 50-i require a claimant to submit a notice to the municipality before filing a lawsuit. The municipality then has the right to demand an examination of claimant during a 50-h hearing. If the municipality demands a § 50-h hearing, the claimant is precluded from filing suit under New York law until he has participated in that hearing. *Id.* at § 50-h(5).

75.     Defendant COUNTY had initially demanded a virtual § 50-h hearing. After conferring with NYSDOCCS and learning of their inability to produce Plaintiff virtually, Defendant COUNTY refused to conduct the 50-h Hearing telephonically. Alternatively, the 50-h Hearing could have been held in person at NYSDOCCS correctional facility and/or telephonically. Defendant COUNTY refused to hold the 50-h in person at the facility.

76.     Multiple departments of New York's Supreme Court, Appellate Division have repeatedly held that even if a plaintiff cannot attend a § 50-h hearing by virtue of his incarceration, he still is obligated to find a way to appear. See, e.g., *Zapata v. Cty. of Suffolk*, 23 A.D.3d 553, 806 N.Y.S.2d 597, 598 (2005). Should he fail to do so, his claims must be dismissed. See id. (rejecting proposition that "plaintiff's incarceration constituted an exceptional circumstance excusing his failure to appear" for § 50-h hearing).

77.     At bar, Plaintiff proposed alternative means of appearing that were reasonable and cost effective for all parties. Defendant COUNTY's unwillingness to hold a telephonic 50-h Hearing, given the circumstances was unreasonable and seemingly strategic so as to deny Plaintiff's ability to pursue a claim against Defendant COUNTY.

78.     A claim under § 1983 for denial of access to the courts derives from "the First Amendment right to petition for redress, the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments." *Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997). Such claims typically fall into one of two categories: (1) where a "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits," such as lack of access to law libraries; and (2) where the litigant claims that "they have irrevocably lost the ability to file a lawsuit, typically because of a massive government cover-up denying plaintiffs the ability to gather evidence." *Ponterio v. Kaye*, No. 06-CV-6289 (HB), 2007 WL 141053, at *9 (S.D.N.Y. Jan. 22, 2007).

79.     Here, Defendant COUNTY denied Plaintiff his day in Court by refusing to hold a telephonic 50-h. NYSDOCCS indicated it had no time frame as to when its equipment would be working.

80.     Defendant COUNTY, through its refusal to conduct its 50-h Hearing telephonically given NYSDOCCS limitations, deprived Plaintiff of his Constitutional rights through Defendant COUNTY's unconstitutional action.

**COUNT I**
**VIOLATION OF PLAINTIFF'S EIGHTH**
**AND FOURTEENTH AMENDMENT RIGHTS (§ 1983)**
**(*Against All Defendants*)**

81.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

82.     Defendants have subjected and continue to subject Plaintiff to cruel and inhumane prison conditions that damaged him and which pose an unreasonable and unjustifiable risk of harm to his health, and have manifested and continue to manifest a pattern of deliberate indifference to this damage and risk of harm. The challenged conditions violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

83.     Defendants knew there was a strong likelihood of harm to Plaintiff and other inmates but failed to take reasonable measures to intervene and prevent flooding and water accumulation in the dorms, despite having numerous opportunities to do so.

84.     In doing so, Defendant COUNTY implements and accedes to a policy and practice that deprives inmates of the baseline civilized requirements of life's necessities, that intentionally or recklessly subjects them to unnecessary and wanton infliction of pain, that imposes punishment that is cruel and unusual, and that violates inmates' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

85.     Defendant COUNTY has also systematically and deliberately ignored, or failed to take reasonable measures to address, the complaints about the deplorable and unconstitutional

conditions raised by the detainees in the NCCC. For years, the men detained in NCCC have submitted grievances through the NCCC's complaint procedures describing the conditions set forth in this Complaint and have sought medical treatment for their injuries arising from these conditions.

86.    Defendant COUNTY's policy, custom, pattern, and practice of such Eighth and Fourteenth Amendment violations have materialized in serious harm to NCCC inmates repeatedly.

87.    Specifically, Plaintiff was severely injured, and visibly bleeding.

88.    In light of Defendants' failures, the known and substantial risk of serious harm, and the failure to take reasonable measures to abate this risk, Defendants exhibited deliberate indifference to Plaintiff's safety.

89.    In doing so, Defendants denied Plaintiff the baseline civilized requirements of life's necessities, subjected him to unnecessary and wanton infliction of pain, imposed cruel and unusual punishment, and violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

90.    That by reason of the violation of Plaintiff's Eighth and Fourteenth Amendment rights, he was damaged as set forth herein.

91.    The violation of Plaintiff's bodily integrity was unreasonable and without due process of law, in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

92.    As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical

and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees.

## COUNT II
## DENIAL AND FAILURE TO PROVIDE MEDICAL TREATMENT PURSUANT TO THE EIGHTH AND FOURTEENTH AMENDMENTS
### (*Against All Defendants*)

93. Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

94. Defendants had an affirmative duty to provide and administer health and medical services to Plaintiff and other NCCC pre-trial detainees.

95. Defendants, as previously alleged, had a duty and obligation to provide Plaintiff and other pre-trial detainees of the NCCC reasonable and adequate health and medical services.

96. Defendants, on information, had knowledge that the healthcare they provided and/or were responsible for providing to Plaintiff and other pre-trial detainees of the NCCC was deficient, inadequate, and incompetent.

97. On information, the health and medical care provided by Defendants or which they were responsible for providing to Plaintiff failed to meet an acceptable standard of treatment and care in terms of modern medicine, technology, and current beliefs about human decency.

98. On information, the health and medical care provided by Defendants, or which they were responsible for providing, created an excessive risk to Plaintiff, and the harm to which Plaintiff was exposed was sufficiently serious as to implicate his Constitutional rights.

99. On information, Defendants knew that Plaintiff's medical condition constituted a serious need for immediate, competent, and adequate medical care and treatment.

16

100.    On information, Defendants knew of and ignored the aforesaid excessive risk to Plaintiff's health.

101.    The denial of adequate medical care as aforesaid created a condition of urgency, where pain, emotional distress, disability, permanent injury, or death was likely.

102.    Defendants' policies, practices, customs, actions, and failures to act constituted deliberate indifference to the serious medical needs of Plaintiff.

103.    Defendants were deliberately indifferent to the serious medical needs of Plaintiff.

104.    As a direct and proximate result of the foregoing, Plaintiff was subjected to great physical and emotional pain and suffering.

105.    Defendants' conduct demonstrated reckless and/or callous indifference to the federally protected rights of Plaintiff.

106.    As a direct and proximate result of the foregoing, Plaintiff was subjected to cruel and unusual punishment and denial of adequate housing, medical care, and treatment.

107.    As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees.

## COUNT III
## DENIAL OF ACCESS TO THE COURTS
### (*Against All Defendants*)

108.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

109.    Defendants' conduct as described herein violates the First, Fifth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 by denying Plaintiff access to the Courts; the ability to prosecute his legal claims and have meaningful access to legal assistance.

110.    The First and Fourteenth Amendments affords pretrial detainees at least the same rights as those afforded convicted prisoners, if not greater rights. In light of the totality of the circumstances discussed in detail above, Defendants - acting under color of state law - have denied Plaintiff access to the Courts and have denied him the ability to meaningfully prosecute his claims against Defendants.

111.    As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees.

### COUNT IV
### MONELL
### (*Against Defendants COUNTY and LaROCCO*)

112.   Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

113.   Upon information and belief, it was the custom, policy, and practice of COUNTY and La ROCCO to tolerate, condone, and encourage Constitutional violations, such as those alleged by Plaintiff herein, by failing to properly punish, charge, reprimand, and investigate allegations and incidents of misconduct by Corrections Officers.

114.   Specifically, COUNTY and La ROCCO have a policy and practice of allowing and fostering inhumane living conditions, by allowing and permitting their Corrections Officers to go unpunished and undisciplined.

115.   In doing so, COUNTY and La ROCCO implement and accede to a policy and practice that deprives inmates of the baseline civilized requirements of life's necessities, that intentionally or recklessly subjects them to unnecessary and wanton infliction of pain, that imposes punishment that is cruel and unusual, and that violates inmates' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

116.   Defendant COUNTY and La ROCCO's policy, custom, pattern, and practice of such Eighth and Fourteenth Amendment violations have materialized in serious harm to NCCC pre-trial detainees repeatedly.

117.   For Plaintiff in particular, Defendant COUNTY and La ROCCO's illegal policy has caused him to incur physical, emotional, and pecuniary harms.

118.    Employees of COUNTY and La ROCCO, such as DOES in this action, were aware at all times alleged in this Complaint that their unconstitutional conduct would not be investigated or questioned, and that they would receive no reprimand or be punished for their conduct.

119.    Employees of COUNTY and LaROCCO, such as DOES in this action, were aware at all times alleged in this Complaint that their unconstitutional conduct would not be investigated or questioned, and that they would receive no reprimand or punishment for their conduct and, further, that they would be indemnified from civil liability regardless of the illegality or unconstitutionality of their actions.

120.    By failing to supervise, train, and reprimand such Corrections Officers, COUNTY and LaROCCO caused the injuries to Plaintiff through the actions and inactions of DOES.

121.    By maintaining a *de facto* policy of automatic indemnification, COUNTY and LaROCCO further caused the injuries to Plaintiff through the actions and inactions of DOES.

122.    Upon information and belief, this custom, policy, and practice of COUNTY and LaROCCO to ignore complaints and/or widespread allegations of inhumane living conditions and failure to provide competent medical treatment created an environment where foreseeable Constitutional violations by the Corrections Officers were rampant, including the violations of Plaintiff's Constitutional rights by DOES.

123.    COUNTY and LaROCCO's failure to take action against DOES involved in this incident and in other similar incidents was part of a custom, practice, and procedure of neglect and deliberate indifference that directly caused the injuries to Plaintiff.

124.    As authorized representatives of COUNTY and LaROCCO, the Corrections Officers' conduct constituted a custom, policy, and practice which renders COUNTY and LaROCCO liable to Plaintiff as a "Person" acting under the color of state law.

125. These customs, policies, and practices which were enforced by COUNTY and LaROCCO were the moving force, proximate cause, or affirmative link behind the conduct causing Plaintiff's injuries.

126. Had COUNTY and/or LaROCCO investigated serious complaints of inhumane living conditions and/or Corrections Officers leaving their posts and/or widespread allegations of same prior to May 18, 2024, DOES would not have been in a position to violate Plaintiff's Constitutional rights.

127. COUNTY and LaROCCO are therefore liable for violations of Plaintiff's Constitutional rights as caused by DOES, as described in more detail in the foregoing paragraphs; and Plaintiff has suffered damages therefrom.

128. That, by virtue of COUNTY and LaROCCO's, and other NCCC Supervisors', failure and refusal to adequately investigate DOES' actions, acquiescence in DOES' conduct, failure to take any remedial action against DOES, allowing DOES to remain employed as officers with NCCC, gross negligence in their supervision of DOES, and deliberate indifference to the rights of others by failing to act on information that Constitutional rights were being violated by DOES, Defendants COUNTY and LaROCCO, which employed these Corrections Officers and policymakers during the relevant time period, exhibited a *de facto* custom, policy, or practice of unconstitutional conduct sufficient for the imposition of municipal liability under *Monell v. Dept. of Social Services*, 436 US. 658 (1978).

129. As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical

and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees.

**COUNT V**
**PENDANT STATE CLAIM – NEGLIGENCE PREMISES LIABILITY**
(***Against All Defendants***)

130. Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

131. At all times herein mentioned, it was the duty of Defendants to maintain the subject location in a safe and proper condition so as to provide for the safety of those lawfully making use thereof.

132. The above mentioned occurrence, and the results thereof, were caused wholly and solely by the negligence of Defendants, their agents, servants, licensees, contractors, subcontractors, employees, and other affiliate agencies and departments, and those acting under their direction, behest, permission, and control in the ownership, operation, designing, creating, managing, maintenance, contracting, subcontracting, supervision, authorizing use, and control of the Subject Premises; in affirmatively creating the defect; in failing to properly maintain the Subject Premises; in allowing the Subject Premises to become obstructed, accumulate excessive amounts of water, deteriorate, and/or in a state of disrepair and/or improper repair; in failing to inspect said Subject Premises; in causing, permitting, and allowing a trap, hazard, and nuisance to be and exist for an excessive and unreasonable period of time, despite actual and constructive notice; in failing to take any necessary steps to alleviate said condition; in failing to undertake proper and/or adequate safety studies and/or surveys; in failing to properly repair said Subject

Premises area before authorizing its use; in failing to erect barricades, or otherwise restrict use of aforesaid area to prevent a hazard, trap, and nuisance from endangering the general public and, more particularly, Plaintiff herein; in failing to warn the general public and, more particularly, Plaintiff herein, of the subject hazard, trap, and nuisance; in permitting and allowing the aforesaid condition to exist on the Subject Premises; in failing to avoid the aforesaid accident which was foreseeable; in failing to properly maintain the pipes at the Subject Premises; in failing to ensure there was proper drainage for the Subject Premises; and in being otherwise negligent, careless, reckless, and grossly negligent at the Subject Premises.

133.    That no negligence on the part of Plaintiff contributed to the occurrence alleged herein in any manner whatsoever.

134.    That as a result of the foregoing, Plaintiff was caused to sustain serious injuries and to have suffered pain, shock, and mental anguish; that these injuries and their effects will be permanent; and as a result of said injuries, Plaintiff has been caused to incur, and will continue to incur, expenses for medical care and attention; and, as a further result, Plaintiff was, and will continue to be, rendered unable to perform Plaintiff's normal activities and duties and has sustained a resultant loss therefrom.

135.    As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00).

## COUNT VI
## PENDANT STATE CLAIM – NEGLIGENT HIRING, IMPROPER SUPERVISION, AND IMPROPER RETENTION
### (*Against Defendants COUNTY and LAROCCO*)

136.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

137.    Upon information and belief, it was the custom, policy, and practice of Defendants COUNTY and LaROCCO to hire certain Corrections Officers and supervisors, including Defendant DOES, without conducting the appropriate background check, investigation, and psychological evaluations.

138.    Upon information and belief, it was the custom, policy, and practice of Defendants COUNTY and LaROCCO to conduct inadequate investigations of Corrections Officers and supervisor candidates as was done with Defendant DOES.

139.    Upon information and belief, it was the custom, policy, and practice of Defendants COUNTY and LAROCCO to inadequately supervise the actions and conduct of Corrections Officers and supervisors, including Defendant DOES.

140.    Upon information and belief, it was the custom, policy, and practice of Defendants COUNTY and LAROCCO to continue to employ Corrections Officers and supervisors, including Defendant DOES, after it is known that such Corrections Officers and supervisors consistently violate the Constitutional rights of persons such as Plaintiff.

141.    These customs, policies, and practices were the moving force, proximate cause, or affirmative link behind the conduct causing Plaintiff's injuries.

142. Defendants COUNTY and LaROCCO are therefore liable for violations of Plaintiff's Constitutional rights as caused by Defendants as described in more detail in the foregoing paragraphs, and Plaintiff has suffered damages therefrom.

143. As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00).

**COUNT VII**
**PENDANT STATE CLAIM – *RESPONDEAT SUPERIOR***
**(*Against Defendants COUNTY and LAROCCO*)**

144. Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

145. By virtue of DOES' employment with Defendants COUNTY and LaROCCO and their actions within their scope of their employment, Defendants are liable for DOES' actions under a theory of *respondeat superior*.

146. As a result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00).

## JURY DEMAND

147.    Plaintiff demands a Trial by Jury of all causes of action so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff SCANGE VOLANT respectfully requests judgment against Defendants, COUNTY OF NASSAU, NASSAU COUNTY SHERIFF ANTHONY J. LaROCCO, in his individual and official capacities, and CORRECTIONS OFFICER JOHN DOES #1-10 (fictitiously named), in their individual and official capacities, as follows:

A.    Under the First Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees;

B.    Under the Second Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees;

C.    Under the Third Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees;

D.    Under the Fourth Count, in the amount of ONE MILLION DOLLARS($1,000,000.00), plus attorney's fees;

E.    Under the Fifth Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00);

F.    Under the Sixth Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00);

G.    Under the Seventh Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00);

H.      Costs and disbursements of this matter; and

I.      Such other and further relief as the Court deems just and proper.

Dated: Garden City, New York
       August 11, 2025

Respectfully submitted,
**HORN WRIGHT, LLP**
*Attorneys for Plaintiff*

By:     /s/*Pablo A. Fernandez*
        Pablo A. Fernandez
        400 Garden City Plaza, Suite 500
        Garden City, New York 11530
        Tel: 516.355.9696
        paf@hornwright.com